MILANETA ROBERTS, Plaintiff

v.

HENRY SESEPASARA, NANCY FERRA, and ESTATE OF MOLITUI SEPETAIO, Defendants

High Court of American Samoa
Trial Division

CA No. 44-87

October 11, 1988

125

Before REES, Chief Justice, AFUOLA, Associate Judge, and LUALEMAGA, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
For Defendants, John Ward

On Motions for Reconsideration, Amendment of Judgment, or New Trial:

This case arose from a dispute among close relatives over the ownership of a small parcel of land in Pago Pago. We held that the defendant Estate of Molitui Sepetaio owns the land, but that plaintiff Roberts is entitled to compensation for improvements for which she paid under the reasonable belief that she was the owner. Both sides take issue with our judgment.

## I. Plaintiff's Motion

Plaintiff Roberts argues that we erred in finding that Molitui Sepetaio did not sign a separation agreement giving Roberts' father the right to build his house on the land. She observes that the purported signature was made during a time when Molitui was very ill, and that the memories of witnesses might have been hazy with regard to Molitui's whereabouts at the time. We did take these circumstances into account before making our original decision, however, and upon reconsideration we reiterate our finding that the signature was not that of Molitui.

Plaintiff also contests our valuation of the house, apart from the value of the land on which it sits, at $15,000. In particular, plaintiff alleges that "the Court erroneously attributed at least half of the value of the house to its location. There were no findings by the Court to justify the conclusion."

126

attributable to improvements made by her while believing in good faith that she was the owner of the land; or (2) the actual cost to her of these improvements.

The proper measure of compensation for a good faith improver --- someone who builds a house or some other permanent improvement on real property in the honest but erroneous belief that he is the owner --- seems never to have been considered by a court of American Samoa. We therefore address the question at some length.

At common law all permanent improvements to land became the property of the landowner on the theory that by being "attached" to the land they "became a part of it." Betz v. Sioux City, 30 N.W.2d 778, 780 (Iowa 1948); see National Bank of Republic of Chicago v. Wells-Jackson Corp., 193 N.E. 215, 218 (Ill. 1934) ("[W]hen personal property became a fixture by annexation to the real estate by some permanent method, the personal property lost its identity as such and became real estate."). This rule, like many of its kind, began as a useful metaphor for what people usually understand themselves to be doing when they engage in a certain sort of transaction. Medieval Englishmen did not really believe that houses, barns, and fences merge with land and become undistinguishable from it. Rather, the difficulty and consequent economic waste involved in removing such things made it most unlikely that anyone would build them in the expectation of retaining a right to remove them.

Unfortunately, metaphors in the hands of judges tend to subsume and replace the facts and ideas they once symbolized. When a legal precept grounded in observation of human behavior is stated as though it were an inexorable law of nature--- and is then restated so often that the metaphysical axiom rather than the underlying concept comes to be regarded as binding precedent --- it often transcends the limits of its logic. A rule that one who builds a house on a tract of land intends it to become the property of the landowner, for instance, suggests an exception when the builder was confused about the landowner's identity, whereas a rule that a house "becomes part of" the land does not. Human relations within the ambit of such a rule come to be governed not by contract but by status; people lose whatever power they once had

128

to order their affairs in ways to which the judicial metaphor is inhospitable.

For a later court to look behind an oft-repeated axiom in order to limit it to cases consistent with its obvious justification, however, lends itself to the accusation that precedent is being disrespected. A more promising approach is to leave the axiom intact and unexamined but to trump it with a counter-axiom. Thus nobody in America today, at least no judge, would deny that houses continue to merge with land and to lose their identities; but the juridical havoc once wreaked by such natural disasters has been mitigated by the maxim that "one who seeks equity must do equity" and by a device called the equitable lien.

The right of a good faith possessor to reimbursement for his improvements, recognized in the civil law at least since the time of Justinian, was at first available in the United States only when the true landowner himself invoked some equitable remedy, or where the common law had been modified by statute. See, e.g., Searl v. School-District No. 2, 133 U.S. 553 (1890); Wakefield v. Van Tassell, 75 N.E. 1058 (Ill. 1905); Rzeppa v. Seymour, 203 N.W. 62 (Mich. 1925); Restatement of Restitution § 42. Since a landowner whose pleading requested only the common law remedy of ejectment did not "seek equity," courts did not generally regard themselves as having the power to "do equity" by imposing a condition of fair compensation for improvements.

Later, possibly as a consequence of the unification of equity and common law pleading and procedure, many courts recognized the existence of an "equitable lien" in favor of the good faith improver, enforceable even when the landowner sought no equitable relief and even when the action had been brought by the improver himself. See, e.g., Hardy v. Burroughs, 232 N.W. 200 (Mich. 1930); Jensen v. Probert, 148 P.2d 248 (Ore. 1944), and authorities cited therein. Many of the equitable lien cases relied on Justice Story's opinion in Bright v. Boyd, 4 Fed. Cas. 127 (1829), to the effect that

> the denial of all compensation to such a bona fide purchaser . . . , where he has manifestly added to the permanent value

129

of an estate by his meliorations and improvements, without the slightest suspicion of an infirmity in his own title, is contrary to the first principles of equity. . . . . To me it seems manifestly unjust and inequitable, thus to appropriate to one man the property and money of another, who is in no default[.] The argument, I am aware, is, that the moment the house is built, it belongs to the owner of the land by mere operation of law; and that he may certainly possess and enjoy his own. But this is merely stating the technical rule of law, by which the true owner seeks to hold, what, in a just sense, he never had the slightest title to, that is, the house. It is not answering the objection; but merely and dryly stating, that the law so holds. But, then, admitting this to be so, does it not furnish a strong ground why equity should interpose, and grant relief?

*Id.*, quoted in <u>Jensen v. Probert</u>, 148 P.2d at 252.

Justice Story's view, asserting as it did the landowner's utter lack of moral or "common sense" entitlement to improvements built by a good faith possessor, would have justified compensation in the full amount by which the value of the land had been enhanced. In fact, the cases relying on the lien theory are virtually unanimous in using the enhanced value of the land, not the costs incurred by the improver, as the measure of compensation. See, *e.g.*, <u>Hardy v. Burroughs</u>, <u>supra</u>; <u>Greer v. Stanolind Oil & Gas Co.</u>, 200 F.2d 920, 923 (10th Cir. 1952) ("[B]enefit to the rightful owner--- not cost to the trespasser is the test of improvement."); <u>Sutton v. Anderson</u>, 31 S.W.2d 1026 (Mo. 1930); <u>Reimann v. Baum</u>, 203 P.2d 387, 392 (Utah 1949) and authorities cited therein.[1]

---

[1] Compensation was generally allowed only where removal of the improvements from the land would have been impractical.

In cases involving things that had been affixed to real estate but that could be removed without too much damage, the courts had developed a "law of fixtures" whereunder the improvements might not be regarded as part

The overwhelming majority of the cases in which enhanced value has been held to be the measure of recovery, however, concerned attempts by an improver to recover costs that were _greater_ than the enhanced value of the land. The courts have observed that the unjust enrichment of the landowner, not the impoverishment of the improver, gives rise to the duty to compensate. It is one thing to require the repossessing landowner to forego an unearned benefit, and quite another to impose a penalty in excess of any such benefit. _See_, _e.g._, _Greer v. Stanolind Oil_, _supra_.

---

of the land at all if the improver had neither intended them to belong to the landowner nor misled the landowner with respect to this intention. In such cases the improver was sometimes entitled to remove the fixtures even though the method of their attachment would otherwise have been characterized as "permanent." _See_ _National Bank v. Wells-Jackson Corp._, _supra_, 193 N.E. at 218. Although this doctrine evolved more or less independently of the equitable doctrines mentioned in the text, it was regarded as "in derogation of the original rule of common law, which subjected everything affixed to the freehold to the law governing the freehold . . . ." 2 Kent's Com. 243, quoted in _National Bank v. Wells-Jackson Corp._, 193 N.E. at 218. The "law of fixtures" was supposed to apply only to movables affixed to immovable property, but some courts have allowed the removal of houses where it can be done without substantial damage to the house or the land. _See_, _e.g._, _Jensen v. Probert_, _supra_. This remedy is obviously to be preferred, since it neither forces the landowner to buy something he does not want nor requires the court to estimate a "fair market value" in a situation where there can be no market. It is, however, rarely practical.

Another remedy, applied in cases where the improvement is of equal or greater value than the land, is to give the landowner a choice between paying for the improvement or selling the land to the improver at a price determined by the court. _See_, _e.g._, _Hardy v. Burroughs_, _supra_.

131

Relatively few cases have addressed the situation in which the costs of the improvement are substantially less than enhanced value. Several cases do support the proposition that the improver's costs operate as a ceiling on his recovery. The idea is that a good faith possessor should be compensated for his improvements to the extent necessary to deprive the true landowner not of any enrichment whatever, but only of unjust enrichment. The landowner's enrichment is measured by the full value of the improvements, but the enrichment ceases to be unjust when the improver has been reimbursed for what he actually spent. See, e.g., Madrid v. Spears, 250 F.2d 51 (10th Cir. 1957); Tashnek v. Hefner, 282 S.W.2d 298 (Tex. App. 1955). Other courts, however, have required reimbursement of the good faith possessor for the enhanced value of the land even where this amount exceeds the cost of the improvements. See, e.g., Sutton v. Anderson, 31 S.W.2d 1026 (Mo. 1930); 41 Am Jur. 2d, Improvements, §§ 28-30; Annot., 24 A.L.R.2d 11, §§ 15-16, and cases cited therein.

It is not necessary to decide which of these rules should apply in American Samoa, since a careful application of the rule advanced by defendants would produce the same result in the present case as the rule originally applied by the Court.

The $15,000 figure designated by the Court as "the [market] value of the house, apart from the land" was arrived at by estimating the market value of the land with the house on it and then subtracting the estimated value of land in this location with no house on it. This figure is therefore identical to "enhanced value," the first element in the formula advanced by defendants. The second element in the formula, the amount plaintiff actually spent on the improvements in 1974, was $8700. If we were to accept defendants' contention that the cost of the improvements must always operate as a ceiling on a good faith possessor's recovery for improvements, then plaintiff would be entitled to the smaller of two amounts: the $15,000 enhanced value, or the amount necessary to reimburse her for the $8700 she spent in 1974.

It would be unrealistic and inequitable, however, to assume that somebody who spent $8700 in 1974 can be made whole by the receipt of $8700 in 1988. According to figures supplied by the Office

132

of Development Planning of the American Samoa Government, the cost of living (and hence the value of money) in the territory has risen at a rate that makes $8700 in 1974 dollars equivalent to $20,413 in 1988 dollars. (Appendix A.) Had plaintiff placed $8700 in a savings account in 1974 rather than investing it in the property she believed to be hers, the 5% interest rate would have turned it into $17,225. (Interest rates on savings accounts tend to reflect but lag behind real changes in the value of money.) Thus the amount necessary to reimburse plaintiff for the cost of her improvements would be greater, not less, than the $15,000 by which these improvements enhanced the value of defendants' land.

The purpose of calculating reimbursement in terms of the present value of the expenditures is not to allow anyone to speculate by building on someone else's property. Rather, it is necessary if the enhanced value/cost of improvements formula is not to be divorced from its purpose: to allow the landowner such enrichment, and only such enrichment, as cannot fairly be attributed to the impoverishment of the good faith possessor. The entire justification for using the cost of improvements as a ceiling on the good faith possessor's recovery is that once the possessor has been made whole he can no longer complain that the enrichment of the landowner is unjust. See Madrid v. Spears, supra, 250 F.2d at 54. Accordingly, the rule must be applied in such a way that the possessor is actually made whole.

In a case where improvements have enhanced the value of land by so much that either the possessor or the landowner must inevitably derive a genuine profit without injury to the other, perhaps the windfall should go to the landowner. But to create such a windfall by means of a formula that only pretends to reimburse the possessor, by returning to him something far less valuable than what he gave, would cause rather than avoid unjust enrichment. We therefore hold that the proper measure of compensation to plaintiff for her improvements is the $15,000 by which they enhanced the value of defendants' land.[2]

_____

[2] In our original opinion we gave defendants a choice between paying $15,000 for the building in the event they wished to keep

Defendants raise several other arguments, all boiling down to characterization of benefits derived by plaintiff from the house and land as profit, windfall, reward, double recovery, etc.; and to the defendants as having suffered corresponding losses, penalties, and so forth, that should be deducted from the compensation due plaintiff. The general answer to these arguments is that they would make sense if the Court had not held plaintiff to be a good faith possessor with an equitable interest akin to part ownership of the property. We have reexamined the various transactions in which both parties engaged to be sure that each receipt and expenditure was counted once and only once. With one exception, we are convinced that the offsets and adjustments sought by defendants would effectively count some of these figures twice and others not at all, to the benefit of defendants and the injury of plaintiff.

In particular, defendants remind us that plaintiff borrowed her $8700 investment from the Development Bank and that she has fallen behind in her repayment schedule. This matter is between plaintiff and the Development Bank, which has charged plaintiff several thousands of dollars in

---

it, or merely paying the remaining balance on plaintiff's loan at the Development Bank if they wished the building removed or destroyed. Our decision to give defendants this option was premised on the view that defendants should pay for the building if and only if they wish to possess and use it, but that plaintiff should in any case be reimbursed for expenditures made in reliance on her good faith belief that she owned the land. For the reasons explained in the text, we now believe these measures of recovery to be one and the same. Plaintiff's reliance interest is properly measured not by the $7100 she now owes the Development Bank, but by the present value of the $8700 she spent in 1974. Her recovery of this amount is, however, limited by the enhanced value of the land attributable to her improvements. Accordingly, the measure of plaintiff's compensation for her improvements should be $15,000 regardless of what defendants wish to do with the house.

additional interest on account of her late payments.

The order which both parties now urge us to modify did, however, refer to the loan balance and to plaintiff's loan payments in two ways. It gave defendants the option to repay the current loan balance in lieu of acquiring and paying for the house, and it gave plaintiff a credit against rent receipts for the payments she made on the loan between 1979 and 1988. We agree with defendants that both of these references were inappropriate. The proper measure of plaintiff's reliance is not the current balance on the loan but the present value of her investment. She should be reimbursed for this investment up to the full value by which it enhanced the value of the property, regardless of the desires of defendants. See note 2, supra. By the same token, this reimbursement effectively compensates her for the payments she made on the Development Bank loan while the house was rented, and we should not have allowed these payments as an additional offset against rent receipts. This part of the judgment will also be modified.[3]

Defendants also point out that about $1200 of plaintiff's 1974 investment was to pay off a preexisting loan made by her father rather than to finance improvements on the house. This is immaterial, since the preexisting loan was for the construction of the house which her father had purported to transfer to her. With respect to $7500 of her investment plaintiff was a good faith improver; with respect to the other $1200 she was equivalent to a good faith purchaser for value. This $1200 purchased something that defendants themselves neither built nor bought, and with respect to which they can therefore assert no equitable claim prior to that of a good faith purchaser --- as they could, for instance, in the land itself if plaintiff or some other person had purchased it from one who was not the owner.

---

[3] The Court's order as modified still protects defendants' title to the property by requiring that the loan be paid in full. Since this payment will be made from funds to which plaintiff would be entitled whether or not she owed the Bank any money, the fact that she has made late payments to the Bank will in no way profit her or injure the defendants.

Although the construction was performed by someone who did not believe himself in good faith to be the owner of the property, it was paid for (to the extent of $1200) by one who did have such a belief. Plaintiff's equitable standing with regard to this $1200 is therefore identical to her standing with regard to the $7500 that paid for improvements after she took possession.

Defendants also contend that since plaintiff did not build the house but only improved it, and since we found that at least half the value of the property is attributable to the land itself, plaintiff should not be entitled to a full fifty per cent of the rents derived between 1979 and 1986. With regard to rents, however, the possessor is entitled to retain whatever she collected less whatever the rental value of the land would have been without her improvements. See Williams v. Beckmark, 33 N.W.2d 352, 357 (Neb. 1948). Since the defendants put on no evidence of what this rental value might have been, it would have been within our discretion to allow them no credit at all for rental value. See Madrid v. Spears, supra, 250 F.2d at 55. In any case it hardly seems unreasonable to estimate the rent on an unimproved 1966 hurricane house at $175 per month.

The rental issue is complicated by the actions of both parties during the period between 1979 and 1986. Each knew of the other's claim but was ignorant of the most basic facts and arguments underlying the opposing claim. Plaintiff clearly believed herself to be the owner of the property at least until the time of our judgment in this case. Either side could have secured a judicial resolution of the controversy in 1980 or so; instead each side resorted at least once to self-help and otherwise let the controversy simmer. During the times when rentals were being received by plaintiff, she cared for the house, made repairs and improvements, and paid for insurance. When defendants were collecting the rent they did none of these things. Under the circumstances we believe it was within our equitable discretion to treat plaintiff as a good faith possessor throughout the period in question and to allocate half of the net rental (receipts minus expenditures) to each party. See Leeds v. Penrose, 15 A. 261, 264 (N.J. Ch. 1888) ("If complainants were slow in bringing their suit, the defendant was too aggressive in making his alleged improvements,

136

after notice. . . . I conclude that negligence may safely be imputed to both. I also conclude that each is entitled to relief . . . .").

Plaintiff's receipts, including a $3000 insurance award, were $14,000. During this time plaintiff spent $6000 for repairs and renovations and $600 for the insurance premium, so that her net receipts were $7400. During the time defendants received the rents they received $10,500 and spent nothing. A payment of $1550 from defendants to plaintiff will cause each side to have received $8950, or one half of the net receipts.

Order

The judgment will be modified to read as follows:

Judgment will enter in behalf of plaintiff Milaneta Roberts and against the defendants in the amount of $1550.

Judgment will enter against defendant Estate of Molitui Sepetaio in the additional amount of $15,000. The Estate shall discharge $7098.97 of this judgment within sixty days by paying Mrs. Roberts' loan at the Development Bank or by arranging for the assumption of the obligation and for the release of Mrs. Roberts from all further liability.

Judgment will enter in behalf of defendant Estate of Molitui Sepetaio, enjoining plaintiff Milaneta Roberts and those in concert with her from going on the land Lugavai.

In all other respects the motions are denied.

137

APPENDIX A

Cost of Living Increases in American
Samoa, 1974-87. (Source: Development
Planning Office, American Samoa
Government.)

| | inflation rates | | | inflated | deflated |
|------|------|-------|-------|-------|-------|
| 1974 | . . . . . . . . . . . . . . . . . . . . . . . | | | 8700 | 8700 |
| 1975 | 19.1 | 0.191 | 1.191 | 10362 | 7038 |
| 1976 | 0.6 | 0.006 | 1.006 | 10424 | 6996 |
| 1977 | 4.8 | 0.048 | 1.048 | 10924 | 6660 |
| 1978 | 5.7 | 0.057 | 1.057 | 11547 | 6281 |
| 1979 | 17.6 | 0.176 | 1.176 | 13579 | 5175 |
| 1980 | 16.9 | 0.169 | 1.169 | 15874 | 4301 |
| 1981 | 8.3 | 0.083 | 1.083 | 17192 | 3944 |
| 1982 | 6.0 | 0.060 | 1.060 | 18223 | 3707 |
| 1983 | 1.7 | 0.017 | 1.017 | 18533 | 3644 |
| 1984 | 1.9 | 0.019 | 1.019 | 18885 | 3575 |
| 1985 | 1.2 | 0.012 | 1.012 | 19112 | 3532 |
| 1986 | 3.1 | 0.031 | 1.031 | 19704 | 3422 |
| 1987 | 3.6 | 0.036 | 1.036 | 20413 | 3299 |